## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CRESCENT TOWING & SALVAGE CO.,** **INC., & COOPER CONSOLIDATED, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-4207** |
| **M/V CHIOS BEAUTY** | **SECTION "K"**(5) |

## ORDER AND OPINION

The Court held a non-jury trial on liability and damages on July 28-August 1, 2008.  The Court makes the following findings of fact and conclusions of law.  To the extent any of the following findings of fact are deemed to be conclusions of law, then this court construes such findings as conclusions of law.

## FINDINGS OF FACT

### A.  Parties

1.  Plaintiff Crescent Towing & Salvage Co., Inc. ("Crescent") is a Louisiana corporation.

2.  At all relevant times Crescent owned and operated: Barge SCB2, Barge SCB7, the M/V GLENN SMITH, the M/V VIRGINIA, the M/V MIRIAM COOPER, the M/V MARGARET COOPER, the M/V PORT HUDSON, the M/V LOUISIANA, the M/V SHELBY F, and the M/V PROVIDENCE.

3.  At its facility located at  1240 Patterson Road in New Orleans, on the west bank of the Mississippi River immediately adjacent to and fronting on the Mississippi River, Crescent had moored the Barge SCB2 and the Barge SCB7 to the bank of the river using three legged steel pilings and mooring clusters.  A port captain's office and a mechanic  shop  had been constructed aboard the  SCB 7 ("maintenance barge")  Crescent's main office, a two-story structure, as well as a

maintenance shop had been  constructed on the SCB 2 ("office barge").  The office barge was located at the downriver end of the Crescent facility.  The maintenance barge was immediately upriver from  and adjacent to the office barge.[1]

    4.  Plaintiff Cooper Consolidated, Inc. ("Cooper"), is a Louisiana Corporation, and at all relevant times owned and operated the crane barge MANDY which was moored at the Crescent facility immediately adjacent to and upriver from the maintenance barge.

    5. Defendant Chios Beauty Shipping and Trading, S.A. ("Chios Shipping")  is a foreign corporation organized and existing under the laws of the Republic of Panama and at all relevant times was the owner of  the  The M/V CHIOS BEAUTY.

    6.  Defendant Harbor Shipping and Trading, S.A. ("Harbor Shipping") is a foreign company which at all material times acted as the manager and  operator of the M/V CHIOS BEAUTY.  At all relevant times, Harbor Shipping made all operational decisions regarding the CHIOS BEAUTY and had the responsibility of telling the vessel's master and crew what was expected of them with respect to operating the vessel.  (Deposition of Konstantinos Orfanos, p. 19-21).

**B.  Facts Relevant to Defendants'  Claims of Deficient Service of Process**

    7.  Crescent executed service of process on Harbor Shipping by serving its general agent Sunrise Shipping Agency, Inc. within the state of Louisiana. (Rec. Doc. 101).   Additionally Crescent executed service of process on Harbor Shipping pursuant to the Louisiana Nonresident Watercraft Act, La. Rev. Stat. 13:3479  by serving a copy of the pleadings on the Louisiana Secretary of State. (Rec.  Doc. 100).

---

[1] For general reference, Exhibit P-1, an aerial photograph,  shows  the configuration of the Crescent facility and the CHIOS BEAUTY following Hurricane Katrina.

8.  Chios Shipping  did not allege the defense of deficient service of process in its answer filed on March 8, 2006 (Rec. Doc. 10).

9.  Chios Shipping did not allege the defense of deficient service of process in its answer to the counterclaim filed by Crescent and Cooper  on July 3, 2007 (Rec. Doc. 81).

10.  Chios Shipping raised the issue of deficient service of process for the first time in the pretrial order (Rec. Doc. 200).

**C.  The Weather and the Voyage of the M/V CHIOS BEAUTY**

11.  Captain Nikolaos Ntouslazis  served as master of the M/V CHIOS BEAUTY at all relevant times.  He received his master's license in 2003.

12.  The M/V CHIOS BEAUTY is a foreign flagged  bulk carrier;  587 feet in length and 89 feet in breadth.  The vessel was equipped with NAVTEX, a dedicated receiver providing worldwide weather reports.  The Court credits the testimony of Captain Kelly Pulsifer, plaintiffs' mooring and navigation expert, that hurricane alerts would have been automatically received on NAVTEX.  Additionally, the vessel is equipped with IMARSAT  (also know as GS DMSS) which provides  satellite based weather information to the vessel.

13.  The M/V CHIOS BEAUTY departed Vera Cruz, Mexico on Thursday,  August 25, 2005, at approximately 6:30 a.m.  CDT bound for the Port of New Orleans to load a cargo of grain at the ADM/Growmark grain elevator pursuant to orders received from the vessel's charterer. (Exhibit D-4)  At the time  the vessel departed Vera Cruz, the master incorrectly thought that Tropical Storm Katrina was near the Virgin Islands, when in fact Tropical Storm Katrina was far northwest of the Bahamas.   (Exhibit P-120, Bates No. 0001, Exhibit D- 29, Bates No. 0457). Katrina strengthened to hurricane status on August 25, 2005.

3

14.  On Friday, August 26, 2005, Roy Adams, an employee of Sunrise Shipping Agency, Inc., Harbor Shipping's agent in New Orleans, spoke to a representative from Harbor Shipping concerning Hurricane Katrina. In his deposition Mr. Adams testified that when he asked the Harbor Shipping representative, who was either Captain Orfanos or maybe Costos Chandres, whether they wanted the vessel to come into New Orleans, he was told "we don't know where the storm is going but bring it in."

15.  At 4:00 p.m. CDT on Friday, August 26, 2005, the National Hurricane Center issued Advisory 14 indicating that Hurricane Katrina had maximum sustained winds of 100 mph and was located southwest of Tampa, Florida moving west-southwest at 8 mph. (Exhibit P-43). The three day projected track placed New Orleans within the potential strike zone, with the hurricane projected to make landfall east of New Orleans on the Mississippi-Alabama Gulf Coast. (Exhibit P-43).

16.  Advisory 15 issued by the National Hurricane Center at 10:00 p.m. CDT on Friday, August 26, 2005, reported that Hurricane Katrina continued to move west-southwest and that a gradual turn to the west and west-northwest was expected on Saturday, August 27. (Exhibit P- 120, Bates No. 0040). Katrina had sustained winds of 105 mph and was "expected to become an intense hurricane in the Central Gulf of Mexico." (Exhibit P-120, Bates No. 0040). The three day storm track predicted that the hurricane would hit Buras, Louisiana. ( Exhibit P-43B).

17.  Hurricane Advisory 16 issued by the National Hurricane Center at 4:00 a.m. CDT on Saturday, August 27, 2005, classified Hurricane Katrina as a Category 3 hurricane, predicted strengthening of the storm over the next 24 hours, and predicted a course that would have the storm striking New Orleans directly. ( Exhibit P- 43-A and Exhibit P-120, Bates Number 0044).

18.   On Saturday,  August 27, 2005, at 8:30 a.m. CDT, the same day that  Hurricane Advisory 16 predicted that Hurricane Katrina would hit New Orleans,  the M/V CHIOS BEAUTY arrived  at Southwest Pass at the mouth of the Mississippi River  for entry into the Port of New Orleans.

19.   Defendants did not urge that economic exigency required that the CHIOS BEAUTY proceed to the port of New Orleans after it arrived at Southwest Pass.   The Court credits the testimony of Captain Kelly Pulsifer that the CHIOS BEAUTY could have been redelivered to her owners upon her arrival at Southwest Pass thereby ended her time charter to ADM.  Moreover, any economic interests are clearly secondary to the safety of the CHIOS BEAUTY and her crew.

20.   At 9:35 a.m. CDT on Saturday,  August 27, 2005, a pilot boarded the CHIOS BEAUTY for her entry into the Mississippi River.

21.  By 10:00 a.m. CDT on Saturday, August 27, 2005, the National Hurricane Center issued a hurricane watch for an area including the Metropolitan New Orleans area.  (Exhibit P-120, Bates No. 0048).

22. Captain Konstantinos Orfanos, the marine superintendent for Harbor Towing, monitored the weather from Kingston, Jamaica, but did not consider diverting the ship from New Orleans after it arrived at Southwest Pass:

> because there was nothing specific.  The range of the forecast that was given for hurricane, it was too wide, and I believed that it was best for the vessel at that time to go to New Orleans. And everybody believed that the cool waters of the Mississippi would not have let the [hurricane] head toward New Orleans . . ..

(Deposition of Konstantinos Orfanos, p. 78-79).

23.   Despite access to  weather information projecting that a Category 3 hurricane would

make a direct hit on New Orleans, Captain Orfanos directed or at the least knowingly acquiesced in the decision for the M/V CHIOS BEAUTY to proceed to New Orleans.    By 6:50 p.m. CDT on August 27, 2005,  the CHIOS BEAUTY had   moored at the Pauline Street Wharf with her bow facing upriver.  The Pauline Street Wharf is just downriver and across the Mississippi River from the Crescent facilities.   The CHIOS BEAUTY was moored just upriver from the CAPE KNOX and the CAPE  KENNEDY, two National Defense Reserve Fleet Ships which were moored abreast of one another at the Poland Street Wharf with their bows to the stern of the M/V CHIOS BEAUTY. The Poland Street Wharf is immediately downriver from  the Pauline Street Wharf on the east bank of the river.

24.  The Court did not find persuasive the testimony of Captain David Marsh, defendants' navigation expert, who testified that there was nothing wrong with the master's decision to enter the Port of New Orleans.  Rather, the Court credits and accepts the testimony of Captain Kelly Pulsifer, which the Court found to be extremely effective and persuasive.  Captain Pulsifer testified  that the CHIOS BEAUTY  should not have entered the Port of New Orleans  with Hurricane Katrina predicted to strike New Orleans  with at least the force of a Category 3 hurricane.

25.  The weather information considered by Harbor Shipping and Captain Ntouslazis  was grossly  insufficient in scope, and their understanding of the weather information was also inadequate.   Captain Ntouslazis  incorrectly placed Hurricane Katrina in the Virgin Islands, as opposed to northwest of the Bahamas on Thursday, August 25.  Captain Orfanos testified,  based on his reading of the book Ocean Passages, that he thought that "the cool waters [of the Mississippi River] would not have let the hurricane to hit New Orleans."  (Deposition of Konstantinos Orfanos, p. 80).   Although both the master and Captain Orfanos testified that they monitored the weather

prior to the vessel's arrival in New Orleans, they did not identify any specific information they considered. The Court finds as a fact that the weather monitoring of the master and Captain Orfanos was virtually non-existent. Additionally, the Court finds that the master and Harbor Shipping had ample time and information to know not to endanger the vessel by bringing it into Port of New Orleans.

26. Captain Ntouslazis's wife arrived in New Orleans prior to the CHIOS BEAUTY's arrival. She boarded the vessel after it moored and remained on board at all relevant times.

**D. The Mooring of the M/V CHIOS BEAUTY**

27. Although no detailed findings of fact regarding the acts and omissions of the defendants following the mooring of the CHIOS BEAUTY need to be made as the Court's determination of liability is not based on any acts occurring after the mooring of the vessel, the Court nonetheless makes the following findings of fact in order to furnish the proper context for the ruling.

Two bollards were missing from the berth assigned to the CHIOS BEAUTY by the New Orleans Dock Board. Captain Ntouzalis accepted the assigned berth. The Court accepts and credits the testimony of Captain Kelly Pulsifer that the master of the CHIOS BEAUTY had the authority to challenge the berth assignment based on the missing bollards.

28. On Saturday, August 27, 2005, at 10:00 p.m. CDT, the National Hurricane Center predicted a storm surge of 15-20 feet above normal tides. (Exhibit D-83, Bates No. 01094).

29. Hurricane Advisory No. 25 issued by the National Weather Service on Sunday, August 28, 2005, at 10:00 p.m. CDT predicted a coastal storm surge of 18-22 feet above normal tide level, locally as high as 28 feet. (Plaintiff's Exhibit 120, Bates page 50). That same day, Nash Roberts, III, an expert meteorologist, predicted a surge to seventeen (17) feet in the Mississippi River.

7

30.  On Sunday,  August 28, 2005, as Hurricane Katrina approached New Orleans, Captain Orfanos, communicated with Captain Ntouslazis of the CHIOS BEAUTY via satellite telephone and advised him to use "whatever ropes and wire ropes" were available aboard the vessel to secure it for the storm.  Captain Orfanos advised that no slack should be left in the mooring lines; he anticipated that any damage would result from wind, not a rise in the river.  (Deposition of Konstantinos Orfanos, p. 85).  Nevertheless, Captain Orfanos  advised the master to have the engines and crew standing by for a rise in the river.  (Id. at p. 84).

31.  Thereafter Captain Ntouslazis ordered that additional lines be applied to secure the vessel against the approaching storm.  When Hurricane Katrina struck New Orleans, thirty (30) lines secured  the CHIOS BEAUTY  to the Pauline Street Wharf, including headlines, spring lines, breast lines, and stern lines.   Captain Ntouslazis testified that he had about four feet of slack in his lines. At no time after adding the additional lines to secure the vessel did Captain Ntouslazis  instruct the crew to tend the lines to adjust for the predicted wind and storm surge.  Moreover, the mooring configuration, which included more than one  mooring line on a number of  bollards prevented members of the crew from slackening the multiple lines on a bollard.

32.  John Verelli, an experienced chief mate, drove past  the CHIOS BEAUTY on his way to his assignment  aboard the CAPE KNOX.  He noted that the CHIOS BEAUTY's lines looked "ratty" which he defined as being in disrepair or a poor state.

33.  The Court accepts the testimony of Walter Paul, plaintiffs' mooring expert,  that sixty percent (60%) of the lines he inspected from the CHIOS BEAUTY were in "really horrible shape" and should have been discarded.

34.  Captain Orfanos did not have the master request tugs to stand by the M/V CHIOS

8

BEAUTY during Hurricane Katrina because he "had to know what was happening in the river before [he] ask[ed] for tugs." (Deposition of Konstantinos Orfanos, p. 80). Captain Ntouslazis had authority to hire tugs. (*Id*. at p. 82). However, at no time did Captain Ntouslazis or anyone acting on behalf of the vessel inquire as to the availability of tugs to standby the M/V CHIOS BEAUTY during the hurricane.

35.  At the request of the CAPE KENNEDY and the CAPE KNOX, Crescent furnished two standby tugs to remain with those vessels throughout the storm to provide additional support to keep the vessels at their moorings. Although a number of lines broke on both the CAPE KNOX and the CAPE KENNEDY, they remained at the Poland Street wharf with the assistance of the stand by tugs and the Crescent tug M/V MARGARET COOPER, which arrived during the storm to provide additional assistance.

**E.  The Breakaway**

36.  As predicted as early as August 27, 2005, prior to the time that the CHIOS BEAUTY entered the Mississippi River, Hurricane Katrina struck New Orleans as a Category 3 hurricane. On August 29, 2005, at approximately 5:30 a.m. CDT all forward lines securing the CHIOS BEAUTY broke, and the vessel's bow swung away from the Pauline Street Wharf towards the west bank. When the forward lines broke, the master ordered the crew to drop the starboard anchor.

37.  The Court accepts the testimony of Walter Paul and Nash Roberts, III, plaintiffs' expert, meteorologist, that when the CHIOS BEAUTY broke her mooring lines hurricane force winds were not present at the Port of New Orleans.

38.  After the CHIOS BEAUTY broke her forward lines, the M/V MIRIAM COOPER, under the command of Captain Michael Domangue, which had been moored at the Crescent facility,

left its safe mooring to provide assistance to the CHIOS BEAUTY as did the M/V MARGARET COOPER which had also been moored at the Crescent facility.   In response to a request from Captain Domangue, the CHIOS BEAUTY dropped her port anchor.

39. The MIRIAM COOPER and the MARGARET COOPER came along the port side the CHIOS BEAUTY and began pushing on the ship in an attempt to return her to the Pauline Street Wharf.  At approximately 5:40 a.m. CDT, the stern lines of the CHIOS BEAUTY broke.  Once the stern lines broke, the MIRIAM COOPER and the MARGARET COOPER proved unable to hold the CHIOS BEAUTY.  The tugs were forced to pull away from the CHIOS BEAUTY as she began turning in the river and moving upriver stern first while continuing to fall towards the west bank of the river while dragging her anchors.  The tugs waited for several minutes to see whether the anchors of the CHIOS BEAUTY would hold her. Once it became apparent that the anchors of the CHIOS BEAUTY would not hold her, and the vessel began falling across the river toward the Crescent facility, the MIRIAM COOPER interposed itself between the CHIOS BEAUTY and the Crescent facility and attempted to push the CHIOS BEAUTY away from the Crescent facility. However, as the vessel's stern continued to fall toward the Crescent facility, the MIRIAM COOPER was again forced to break away and escape to a position of safety.  As the CHIOS BEAUTY was falling across the Mississippi River, strong northeast winds were blowing across the river from the east to the west bank

40. John Richardson, a deck hand employed by Crescent aboard the tug PORT HUDSON. testified that the PORT HUDSON was moored to the upriver end of the Crescent maintenance barge and that while the tug was still moored he saw the CHIOS BEAUTY "pointing directly at us." Jimmy Ranna, the captain of the PORT HUDSON ordered the lines mooring the PORT HUDSON

released, and maneuvered his tug to safety, beyond the path of the CHIOS BEAUTY.  Mr. Richardson testified that when the PORT HUDSON left its mooring on the maintenance barge, the GLENN SMITH and the VIRGINIA were still moored at the Crescent facility.  He further testified that he saw the stern of the CHIOS BEAUTY swinging in "hard . . . toward the fleet, toward the crane barge."  He heard a loud crash and saw the ship hit the crane barge. The Court credits the testimony of John Richardson.

41.  Although there is conflicting testimony concerning the exact locations  where the VIRGINIA and the GLENN SMITH were moored, the eyewitnesses agree that the neither tug was moored to the crane barge MANDY.

42.  The stern of the CHIOS BEAUTY struck the crane barge MANDY at an angle. Photographs of the crane barge show the indentation of compressed steel and significant damage that could not have been caused by the wind.  (Exhibit P-11, No, 144-147, Exhibit P-106, Bates No. 0030-0032).

43.  Only approximately 20 minutes elapsed from the time that the CHIOS BEAUTY broke all of her lines until she allided with the crane barge.

44.  The VIRGINIA and the GLENN SMITH were trapped between the Crescent facility and the CHIOS BEAUTY.  Both tugs had tire bumpers on all sides.

45.  After the falling stern of the CHIOS BEAUTY allided with  the crane barge MANDY, the  PORT HUDSON and the MIRIAM COOPER maneuvered to a position to push on  the port side of  the CHIOS BEAUTY to pin her against the Crescent facility where she remained for some time.

46.  Thereafter the master of the CHIOS BEAUTY ordered the  engines engaged and drove the CHIOS BEAUTY forward down river,  scraping against the entire length of the Crescent facility

11

and dragging  the VIRGINIA and the GLENN  SMITH with her.  Once the CHIOS BEAUTY

passed the down river  end of  the Crescent facility, she drove herself,  the VIRGINA and the

GLENN SMITH  against the west bank of the river.  The Court also rejects defendants' contention

that the MIRIAM COOPER and the PORT HUDSON pushed the CHIOS BEAUTY into the down

river corner of the Crescent office barge.

47.  Captain Domangue then repositioned the MIRIAM COOPER to once again push on the

port side of the CHIOS BEAUTY to hold her against the west bank. The MIRIAM COOPER

continued to push against the port side of the CHIOS BEAUTY for several hours until it became

apparent that the river level was declining and that the CHIOS BEAUTY was aground.

48.  The Court  credits the testimony of Paroussis Konstantinos, the Chief Engineer of the

M/V CHIOS BEAUTY who testified  that the CHIOS BEAUTY  struck the crane barge MANDY,

the offices of Crescent, and the tugs GLENN SMITH and VIRGINIA.  He testified that the CHIOS

BEAUTY fell "on the tugs and the offices that were there and had knocked them on the shore."

(Deposition of Paroussis Konstantinos, p. 37, 43).  After hearing a "boom" Mr. Konstantinos left

the engine room and went to the bridge and saw that the GLENN SMITH and the VIRGINIA had

already been pushed up on the west bank of the river and were pinned by the CHIOS BEAUTY.

Mr. Konstantinos testified that he heard a noise and then "something like dragging."  He further

testified that after the CHIOS BEAUTY fell on the Crescent facilities, the master of the CHIOS

BEAUTY ordered that the engines move to dead slow ahead, slow, and half-ahead.  This testimony

corroborates the testimony of John Richardson that the CHIOS BEAUTY drove ahead after hitting

the crane barge, as well as the testimony of  Vic Digiorgio, a deck hand aboard the MIRIAM

COOPER, that as the MIRIAM COOPER was pushing on the CHIOS BEAUTY after it struck the

crane barge that the CHIOS BEAUTY began driving forward. Mr. Konstantinos's testimony is also consistent with Mr. Digiorgio's testimony that he saw wheel wash from the CHIOS BEAUTY while the MIRIAM COOPER was pushing on the CHIOS BEAUTY after it allided with the crane barge.

49. The Coast Guard's AIS data (Exhibit D-14) correlates the positions of the CHIOS BEAUTY, MIRIAM COOPER, PORT HUDSON, MARGARET COOPER, and CAPE KNOX to precise times throughout the relevant time period. The Court does not find the AIS evidence to be conclusive evidence of individual vessel movements. The value of the AIS evidence is diminished because the system was not fully operational during Hurricane Katrina. The AIS system has several components, including one designed to correlate the GPS signal from the transponder aboard a vessel to the actual time, to the second. A second component of the AIS system provides a radar created outline image of the vessels emitting transponder signals. During Hurricane Katrina, the AIS component which would create radar images of the vessels emitting transponder signals was not operational. Thus, the precise juxtaposition of the vessels emitting GPS transponder signals, including the CHIOS BEAUTY, the MIRIAM COOPER, the MARGARET COOPER, and the PORT HUDSON could not be determined. Absent that precise juxtaposition, the Court finds that the AIS data is not conclusive.

Moreover, during the relevant period, the AIS system experienced several "glitches" which further reduce the persuasive value of the AIS evidence. For example, the CAPE KENNEDY is never visible on the tape. Additionally the tape indicates that at 5:41:33 a.m. the the PORT HUDSON moved from the west bank of the river to the east bank of the river in the vicinity of the CAPE KNOX and returned to the west bank at 5:41:41a.m. There are at least five occasions where

the tape indicates that the PORT HUDSON crosses the river and returns to the west bank in a matter of seconds.  The Court does not find the AIS evidence persuasive to the extent that the Court is willing to discredit eyewitness testimony concerning the movement of the vessels involved herein in favor of the AIS evidence.

50.  Because the AIS evidence  is not the best evidence of the movements of the vessels involved herein , the Court does not find the testimony of Dr. Haruzo Eda, defendants' expert in the fields of hydrodynamics, ship motion, and ship trajectory,  concerning his computer simulation based on the AIS evidence to be persuasive and does not accept his testimony that the CHIOS BEAUTY did not strike the crane barge MANDY, but instead remained 40-41 feet away from the Crescent facility. Dr. Eda relied upon  the AIS data which is based on GPS information to plot the movements of the vessels on the river, and the Court generally accepts those findings.  However, Dr. Eda superimposed his findings on a drawing which included both the river and its banks, and the Court is not satisfied that the bank lines accurately represent the bank lines of the Mississippi River.  Additionally, the Court is not persuaded that Dr. Eda's positioning of the vessels with respect to the actual location of the Crescent facilities is accurate. The Court notes that Dr. Eda conceded that he is not an AIS expert, but stated that he used AIS data comfortably.

51.  The Court accepts the testimony of Captain Ronald L. Campana, plaintiffs' expert marine surveyor, who testified after surveying the damage to the Crescent facilities and the CHIOS BEAUTY that "[i]t was more probable than not that the  CHIOS BEAUTY did the damage to the Crescent mooring facility."  (Deposition of Captain Ronald L. Campana, p. 50).   The damages to the Crescent facilities are consistent with the fresh horizontal scrape marks and the rub marks on the starboard stern of the CHIOS BEAUTY.  Additionally, Captain Campana noted white paint marks

on the starboard hull of the CHIOS BEAUTY which were consistent with the white paint on the office structure at the Crescent facility.

52. The Court rejects defendants' contention that the VIRGINIA and GLENN SMITH broke free of their moorings and hit and damaged the crane barge. Common sense dictates that had the VIRGINIA or the GLENN SMITH, or both, broken loose of their moorings as a result of wind or surge, moved upriver, and allided with the crane barge, they would not have come to rest downriver from the crane barge at a time when the river was still flowing upriver due to the surge from Hurricane Katrina. Additionally, the Court accepts the testimony of Captain Ronald Campana that the damage to the crane operator's cab of the crane barge could not have been caused by contact between either the VIRGINIA or the GLENN SMITH and the crane barge because the damage is too far inboard and tugs could not have reached that far inboard. (Deposition of Captain Ronald L. Campana, p. 93). The Court also credits Captain Campana's testimony that the VIRGINIA and the GLENN SMITH could not be responsible for the damage sustained by the structures on the maintenance barge or the office barge because the damage occurred too far inboard. (Deposition of Captain Ronald L. Campana, p. 94-95).

**F. Damages**

53. The crane barge MANDY sustained significant damage. The outboard side of the crane operators cab was pushed in along the length of the cab. which resulted in damage to the operator's console, seat, and operation levers. Additionally, the allision shattered the glass panels in the operators cab and damaged the steel louvered opening of the diesel engine radiator. (Exhibit P-114, photographs 144-148). The Court adopts James Denny's opinion that the cost to repair the crane is $279,000.00.

54.   The office building on the office barge was  heavily pushed inshore as was the maintenance shop on that barge.    Photographs of the office building (Exhibit P-114, photographs 2-6) reveal twisted metal  inconsistent with wind damage and consistent with metal on metal damage.  Both the upper and lower floors of the office building show extensive damage.  The office building is a total loss.  In order to repair the barge it is necessary to remove the building from the barge at a cost of $108,600.  The cost to drydock and repair the office barge is $156,802.00.   The Court accepts the testimony of William R. Janowsky, defendants' expert civil and structural engineering specializing in marine construction,  that $175.00 per square foot is a reasonable replacement cost for the damaged office structures and that $100 per square foot is a reasonable cost range for replacing the maintenance/storage structures on Crescent's barges.  Therefore, the cost to replace the office structure on the office barge is $1,680,000.00 ($175.00 x 9,600 square feet), and the cost to replace the maintenance shop on the office barge is $330,000.00 ($100.00 x 3.300 square feet).

55.   The buildings on the maintenance barge sustained massive damage. The port captain's office which was on the upriver end of the maintenance barge was totally destroyed, while the workshop, located downriver from the port captain's office was leaning inshore.  Applying the previously determined replacement costs, the cost to replace the port captain's office is $122,500.00 ($175 x 700 square feet), and the cost to replace the other structure  is $70,000.00 ($100 x 700 square feet).  Therefore, the total replacement cost for the structures on the maintenance barge is $192,500.00

56. A steel  gangway ran from the west bank levee to the office  barge. The gangway was equipped with handrails, and an electric hoisting system that could be used to raise or lower the

16

gangway depending on the height of the river.  The metal walkway of the gangway was compressed and twisted, and a portion of it fell into the river. (Exhibit P-114, photographs 7-10).   The gangway was totally destroyed.    The reasonable cost to replace the gangway is $40,500.00.

57. The mooring system , consisting  of steel dolphins and pilings, that connected to the office barges to the levee was rendered useless.  The pilings were broken and pushed towards the shore. (Exhibit P-114, photographs 3 and 4). The Court accepts Captain Campana's testimony that the damaged mooring system had to be removed and replaced.  The total replacement cost for the mooring clusters and pilings is $503,000.00 (Exhibit P-116, Invoices of River Construction).

Because the mooring dolphins and pilings were not new at the time of the loss, the replacement cost must be depreciated to reflect the remaining useful life of the dolphins and the pilings. The Court finds William Janowsky's testimony that the steel mooring dolphins had an estimated useful life of forty (40) years to be persuasive.  The evidence establishes that those dolphins were installed at the Crescent facility not later than  1974, and had therefore been in use for 77% of their anticipated useful life.  The evidence is less clear concerning the useful life of the pilings and the date that they were installed.  For the sake of consistency,  the Court will also apply a depreciation rate of 77%  to the replacement cost of the pilings.  Following depreciation, the replacement cost of the dolphins and pilings is $115,690.00

58.  As a result of being dragged by the CHIOS BEAUTY, the M/V VIRGINIA wound up aground on the rip rap of the west bank levee.  Bisso Marine Company, Inc. salvaged the tug  at a cost of $127,500.00. (Exhibit P-116, Invoice of Bisso Marine Company, Inc.).   Additionally, the vessel was dry docked at Bollinger Shipyards for repairs resulting from the allision and grounding. The necessary, and undisputed repairs total $59,149.00. (Exhibit P-116, Invoice of Bollinger

shipyards).   Additionally, the tanks of the VIRGINIA required cleaning at the cost of $20,957.50. (Exhibit P-116, Invoices of Wilco of Houma, Inc.).

59.   The M/V GLENN SMITH also had to be salvaged from the levee at a cost of $127,500.00.  (Exhibit P-116, Invoice of Bisso Marine Company, Inc.).   The grounding damaged a section of the bulwark which required that a new bulwark section be fabricated and installed at the cost of $994.90. (Exhibit P-116, Invoice of Cooper-Wilkins Welding & Machine Co., Inc.).

60.   The destruction of the port captain's office resulted in the loss of Crescent's technical drawings for its tugs. The testimony of Arthur Sargent, plaintiff's expert naval architect, concerning the cost of replacing the necessary plans for the twelve Crescent tugs for which plans are otherwise unavailable is undisputed.  He testified that the cost to re-construct the necessary  plans is $1,350,000.00.  Additionally, the tugs for which plans had to be re-constructed would experience downtime and encounter docking fees totaling $150,000.00.   The Court also accepts Mr. Sargent's testimony that there would also be $24,000.00 in expenses incurred in surveying the tugs, including hourly charges  to survey the tugs, a rental car, mileage, air fare, hotel bills, and subsistence expenses.[2]  Thus, the total damages resulting from the loss of the tug plans is $1,524,000.00.

61.   In an attempt to mitigate its damages by resuming operations as quickly as possible, Crescent obtained trailers to use as temporary offices.  Crescent purchased two trailers to be installed on the barges, and also rented two trailers to be used at its facility.  Crescent paid $28,133.71 in trailer rental.  The purchase price for the two trailers, less the $5,000.00 received for the subsequent sale of one of the trailers, totaled $55,000.24.  Additionally Crescent expended $89,500.00 in

---

[2] This item of damage was inadvertently omitted from the Order and Opinion read to the parties on August 13, 2008.

transportation costs to move the two trailers it purchased to its facility.

62.  Crescent also expended $8,036.00 to transport two generators and a crane to its facility in order to enable it to resume business. (Exhibit P-116, Invoices of Plimsol Marine, Inc.).

63.  At the request of Crescent, the United States Marshal arrested the CHIOS BEAUTY. Crescent incurred $1,387.65 in expenses with the U.S. Marshals Service in connection with the arrest of the vessel as well as $8,389.80 in arrest expenses with Gulf Inland Marine Services, Inc. (Exhibit P-116, Invoices of Gulf Inland Marine Services, Inc. and Invoice of U.S. Marshals Service).

**G.  Salvage**

64.  The parties agree that M/V CHIOS BEAUTY's breakaway from the Pauline Street Wharf constitutes a marine peril.

65.  Between 2003 and Hurricane Katrina, Crescent Towing provided tugs to assist the CHIOS BEAUTY, either at the request of Chios Shipping or ADM approximately 100 times.  In each of these cases, Crescent was paid for its services in accordance with its published tariffs.

66.  Following Hurricane Katrina, Crescent mistakenly invoiced Chios Shipping $23,940.00 for the services provided by the MIRIAM COOPER and the PORT HUDSON to the CHIOS BEAUTY on August 29, 2005.  Additionally, on August 29, 2005, the Crescent tugs LOUISIANA, MIRIAM COOPER, PORT HUDSON, and SHELBY F provided $9,100.00 in services to the CHIOS BEAUTY.  On August 30, 2005, the LOUISIANA, MIRIAM COOPER, and the POINT CLEAR provided additional tug services to the CHIOS BEAUTY in an attempt to refloat the vessel, at a cost of $11,760.00.  On September 3, 2005, an additional $23,400.00 in tug fees for the use of the tugs LOUISIANA, MIRIAM COOPER, PROVIDENCE, and SHELBY F was incurred by the CHIOS BEAUTY.  For the period from August 29, 2005 until September 3, 2005, the CHIOS

BEAUTY received tug services from Crescent in the amount of $56,448.00. The parties have agreed that $3,100.00 of that total must be deducted from any tug service fees owed by CHIOS BEAUTY because that amount represents billing errors resulting from "double billing." Therefore, the actual tug charges for Crescent tugs incurred by the CHIOS BEAUTY between August 29, 2005 and September 3, 2005 is $53,348.00

67. The Court accepts the testimony of plaintiffs' expert ship appraiser Larry Strouse that the value of the CHIOS BEAUTY at the time of the loss was $5,500,000.00.

68. Following negotiations between counsel for Crescent and counsel for the CHIOS BEAUTY, the Shipowners Claim Bureau, Inc., as manager for and on behalf of the American Owners Mutual Protection and Indemnity Association, Inc. ("Underwriters") issued a Letter of Undertaking in the amount of $3,750,000.00. The letter provides in pertinent part:

> WE HEREBY undertake to pay you any such sum or sums which either may be agreed to between the parties and approved by the Association, or which is adjudged to be due to Crescent/Cooper in the matter pending in the United States District Court for the Eastern District of Louisiana bearing civil action No. 05-4145 (except for the salvage claim therein) from the Vessel, in rem, and/or its Owner by final judgment, not subject to appeal of a Court or Tribunal of competent jurisdiction, provided that the total of our liability hereunder shall not exceed the sum of US$3,750,000.00 (THREE MILLION SEVEN HUNDRED FIFTY THOUSAND UNITED STATES DOLLARS) inclusive of interest and costs.
>
> . . .
>
> [Crescent Towing's] right to challenge the sufficiency of the security is reserved and we agree to provide a surety bond or other security as a substitute for this letter of undertaking if ordered by the Court. The amount of this undertaking may be increased or decreased by agreement of the parties or, failing such agreement, by Order of a court or Tribunal of competent jurisdiction.

69. The letter of undertaking contains no definitive stipulation of value.

20

70. The letter of undertaking does not include any reference to Crescent's claim for salvage.

71. Shortly before trial, plaintiffs filed a "Motion to Increase Security" (Rec. Doc. 145). seeking to increase the security to $5,500,000.00 to cover the increased value of plaintiffs' claims for damages and to provide security for Crescent's claim for salvage. The parties agreed that consideration of the motion should be deferred until trial.

72. In its answer, CHIOS SHIPPING alleged that plaintiffs' losses and damages occurred without its privity or knowledge and therefore it was entitled to limitation of liability.

## CONCLUSIONS OF LAW

1. The Court's subject matter jurisdiction is grounded on admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2. The Court has *in rem* jurisdiction over the M/V CHIOS BEAUTY.

3. Plaintiffs executed valid service of process on Harbor Shipping. The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"), which provides the exclusive means of serving process abroad, "appl[ies] only when the internal law of the forum requires service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 702, 108 S.Ct. 2104, 2109-10, 100 L.Ed.2d 722 (1988). Louisiana Code of Civil Procedure article 6A(1) permits service of process upon the "agent for the service of process" of a defendant. The Louisiana Nonresident Watercraft Act designates the Louisiana Secretary of State as the agent for service of process for any non-resident operator of any watercraft within Louisiana. La. Rev. Stat. §13:3479. Because plaintiffs complied with the Louisiana Nonresident Watercraft Act in executing service of process upon the Louisiana Secretary of State and thereby validly served Harbor Shipping, it was unnecessary to transmit documents abroad for service. Therefore the Hague Convention is

inapplicable.

4.  The defense of deficient service of process  is waived if it is not raised in a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure or urged in a responsive pleading. Fed. R. Civ. P. 12(h)(1). Because Chios Shipping did not  urge the defense of deficient service of process in a motion to dismiss under Rule 12(b)(1) or in its answer, it has waived the  defense of insufficient service of process.  *See City of Clarksdale v. BellSouth Telecommunications, Inc.*, 428 F.3d 206, 214 n. 15 (5th Cir. 2005)("Filing an answer to the complaint without objecting to service of process does, however, waives a defendant's right to objection to service of process."); *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 942 (5th Cir. 1999)("If the defendant appears, but fails to assert certain personal defenses [including deficient service of process], then under Rule 12(h) we consider these defenses waived."); *American States Ins. Co. v. Estate of Nabors*, 100 F.3d 953 (5th Cir. 1996) (Under Fed. R. Civ. P. 12(h)(1)(B), the defense of insufficient service of process is waived unless made in a party's first responsive pleading or an amendment thereto allowed as a matter of course.")(unpublished opinion).

Moreover, Chios Shipping did not restrict its appearance in this litigation as permitted under Supplemental Admiralty and Maritime Claims E(8) which provides in pertinent part:

> An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment, may be expressly restricted to the defense of such claim, and in that event is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served.

5.  The Court construes the counterclaim filed on behalf of plaintiffs Crescent and Cooper as an amended complaint.

6.  Chios Shipping, Harbor Shipping, and the master of the CHIOS BEAUTY were negligent in failing to prudently monitor and interpret the available weather information concerning Hurricane Katrina and for sailing the vessel into the Port of New Orleans and directly into the path of Hurricane Katrina.  That seven other ships elected to enter the Port of New Orleans on the same day as the CHIOS BEAUTY does not preclude a finding that the defendants were negligent in directing the CHIOS BEAUTY to proceed to the Port of New Orleans.  The Court was not presented with any evidence concerning the points of embarkation of those seven vessels, the times at which they entered the Port of New Orleans, their ultimate destinations, or in fact, any details concerning those vessels.  Nor was the Court presented with any evidence concerning the number of vessels destined for the Port of New Orleans that altered their plans and docked elsewhere due to the Hurricane Katrina's approach.

The westward shift of Hurricane Katrina occurred in sufficient time for the CHIOS BEAUTY to divert to another port.  The National Hurricane Center predicted prior to the time the CHIOS BEAUTY arrived at Southwest Pass that New Orleans would sustain a direct hit by Hurricane Katrina. Although predicting the path of hurricanes is not an exact science, the various computer models reflected only minimal variations in predicting that Hurricane Katrina would strike New Orleans. Reasonably prudent mariners do not disregard projections of a direct hit. Where as here, it is possible to avoid the storm, they attempt to do so.

It would have been far more prudent for the CHIOS BEAUTY to seek refuge in the western Gulf of Mexico, which was beyond the projected path of Hurricane Katrina, especially in view of the fact that the CHIOS BEAUTY lacked self adjusting winches which would have permitted the vessel to respond to the surge in the Mississippi River and standby tugs to assist in keeping her

against the wharf, as well as the defendants' failure to take all reasonable precautions which a reasonably prudent mariner would have taken to address the predicted river surge which available weather information predicted would accompany Hurricane Katrina, including the use of standby tugs throughout the storm. Moreover, by electing to have the CHIOS BEAUTY proceed to the Port of New Orleans, the defendants eliminated the vessel's opportunity to avoid the storm altogether by sailing for a safe port in the western Gulf of Mexico. Entry into the Port of New Orleans guaranteed that the vessel would encounter Hurricane Katrina in a narrow channel where she would be subjected to the both wind and surge conditions, conditions which reasonably prudent mariners would have anticipated.

7. Defendants seek exoneration from liability urging that plaintiffs' damages were proximately caused by an "Act of God," i.e., Hurricane Katrina. The Court rejects the "Act of God defense." "A defendant may be found negligent but still be exonerated from liability of the 'Act of God' if it would have produced the same damage, regardless of that negligence, because the defendant's negligence was not the proximate cause." *Skandia Insurance Co., Ltd. v. Star Shipping AS,* 173 F.Supp. 2d 1228, 1240 (S.D. Al. 2001)(internal citation omitted). However,

> human negligence as a contributing cause defeats any claim to the "Act of God" immunity[,] because of an "Act of God" is not only one which causes damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant, could not have prevented the damage from the natural event. *See* GILMORE AND BLACK, THE LAW OF ADMIRALTY, at 163-164. FN22 Indeed, an "Act of God" will insulate a defendant from liability *only* if there is *no* contributing human negligence and the defendant has the burden of establishing that weather conditions encountered constituted an uncontrollable and unforeseeable cause by "Act of God."

*Id.* at 1240-41 (footnotes and internal citation omitted).

Here, weather information predicting a direct hit on New Orleans by Hurricane Katrina was available to defendants before the CHIOS BEAUTY arrived at Southwest Pass. The defendants either chose to ignore that information or misinterpreted it. In either case defendants did so at their peril. At the time that the CHIOS BEAUTY entered the Mississippi River bound for the Port of New Orleans, both the path of Hurricane Katrina and its accompanying surge in the Mississippi River were reasonably foreseeable.

This case is easily distinguished from the *HRD Corp. v. Lux Int'l Corp.*, 2007 WL 2050366 (S.D. Tex. 2007) and *Coex Coffee International v. Depuy Storage & Forwarding, LLC*, 2008 WL 1884041 (E.D. La. 2008). In those two cases where the court adopted an "Act of God" defense with respect to damages caused to property due to Hurricane Katrina, the property suffering the damage was at all relevant times already within the path of Hurricane Katrina. Here however, Hurricane Katrina posed no risk for the CHIOS BEAUTY until the defendants failed to heed the available weather data and intentionally placed the vessel in the path of Hurricane Katrina with apparent disregard for its safety.

*In re: SS WINGED ARROW*, 300 F. Supp. 358 (E.D. La. 1969), aff'd 425 F.2d 991 (5th Cir. 1970) is also inapplicable because the vessels involved were already in port when Hurricane Betsy struck New Orleans. They did not elect to proceed to the Port of New Orleans after weather experts predicted that the storm would hit New Orleans.

8. Relying on *Pizani v. M/V COTTON BLOSSOM*, 669 F.2d 1084, 1089 (5th Cir. 1982) defendants contend that the plaintiffs have the burden of segregating what portions of their damages were caused by Hurricane Katrina, by contact with the VIRGINIA or GLENN SMITH, or by other causes, and that absent such proof, plaintiffs' claims should be dismissed under the "rule of the

floating subtrahend." The Court rejects the "rule of the floating subtrahend " which provides for dismissal of the action:

> where a plaintiff has shown the gross amount of expense or loss, but where defendant is not liable (by substantive law) for all of the loss, or where it appears that certain credits or deductions should be made against the total expense. In such cases, some courts are strict in requiring plaintiff to prove affirmatively the amount that should be subtracted, before he can recover anything on account of the loss or expense in question.

*Id.* at 1089. The Court declines to engraft this common law rule supporting dismissal into the maritime law. For the reasons stated herein above, the Court concludes that plaintiffs have established by a preponderance of the evidence that all of the damages for which they seek recovery were caused by the CHIOS BEAUTY. There is no other reasonable explanation for the damages sustained by the Crescent facility.

9. Having concluded that the CHIOS BEAUTY caused all of the damages for which plaintiffs seek recovery, the Court concludes that the counterclaim of Chios Beauty lacks merit and it is hereby dismissed.

10. The awards for the damages sustained by the structures aboard the office barge and the maintenance barge are not subject to a deduction for depreciation. "[D]epreciation cannot be applied to damages to a fixed marine structure when the damages are integral parts or areas of the structure, and regardless of their condition would need to be replaced if the structure as a whole were replaced." *Union Pacific Railroad Co. v. Heartland Barge Management, L.L.C.,* 2006 WL 2850064 at *16 (S.D. Tex. 2006), citing *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-06 (5th Cir. 1994).

11. Despite Crescent's extensive history of providing tug service to the M/V CHIOS

BEAUTY prior to August 29, 2005, at its published tariff rate, the Court concludes that Crescent did not have a  contract with the CHIOS BEAUTY for salvage on August 29, 2005.  The vast majority, if not all, of the prior tug service provided by Crescent to the CHIOS BEAUTY was provided pursuant to an agreement between Crescent and ADM/Growmark, the operator of the grain elevator, which mandated that the vessel while taking on or discharging cargo at the ADM/Growmark facility be assisted by Crescent tugs.  Neither that agreement nor the prior assistance provided by Crescent tugs to the CHIOS BEAUTY pursuant to that agreement created a contract of salvage between Crescent and the CHIOS BEAUTY or her owner or operator.  Thus, the law of pure salvage is applicable in determining whether Crescent is entitled to an award for salvage.

12.  "[A]n award of salvage is generally appropriate when property is successfully and voluntarily rescued from maritime peril."  *Margate Shipping Co. v. M/V OGERON*, 143 F.3d 976, 984 (5th Cir. 1998), *citing The SABINE*, 101 U.S. 384, 25 L.Ed. 982 (1880).  It is undisputed that a marine peril existed and that the Crescent  tugs voluntarily rendered assistance to the CHIOS BEAUTY.  Thus the  only salvage element in dispute is whether the Crescent tugs were successful.

Clearly the goal of the Crescent tugs  was to pin the CHIOS BEAUTY  against some object in order to  prevent further movement of the vessel and to prevent it from becoming involved in an allision or a collision.   Although the MIRIAM COOPER and the MARGARET COOPER were successful for a brief period of time in  holding the CHIOS BEAUTY against the Pauline Street Wharf, the tugs were  ultimately unable to maintain that control,  and the CHIOS BEAUTY, subject to the vagaries of Hurricane Katrina's wind and river  surge, traveled to the west bank of the Mississippi River where, as previously described, she allided with the Crescent facilities.  Despite

the valiant efforts of the Crescent tugs and their employees, the event  which the rescue was designed to eliminate, i.e., an allision or collision between the CHIOS BEAUTY and other property, nonetheless occurred.

Crescent  urges that despite the allision and the subsequent grounding of the CHIOS BEAUTY its salvage efforts were a "success" because,  as a result of the  intervention and efforts of Crescent's tugs and employees,  damage to the CAPE KENNEDY, the CAPE KNOX, and  to the lash barge fleet upriver from the Crescent facility was averted.  Crescent cites no case in support of this contention.  Moreover, the Court has located no case in which a salvage was found to be successful in whole or in part because of a salvor's efforts  averting damage to a third party.  In *Allseas Maritime, S.A. v. M/V. MIMOSA*, 812 F.2d 243, 247 (5th Cir. 1987), the Fifth Circuit considered, but rejected,  the propriety of compensating a salvor for the environmental liability avoided by virtue of the salvage, concluding that because the Limitation of Liability Act of 1851, 46 U.S.C. §§183-88 (1982) limited the salved vessel's liability, the salvor did not save the owner of the salved vessel from loss of other assets.  *Allseas Maritime* however did not address averted liability in the context of determining whether a particular salvage effort was successful, nor apparently has any other case.  There is no statutory or jurisprudential foundation for granting Crescent an award of salvage because  its actions  prevented the CHIOS BEAUTY for damaging the property of third parties.

13.  Although Crescent is not entitled to an award of pure salvage, it is entitled to recover the $53,348.00 for the services its tugs rendered in assisting the CHIOS BEAUTY on August 29, 2005 August 30, 2005, and September 3, 2005.

**H.  Increase in Security**

28

14.  Rule E(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which addresses the release of property in *in rem* actions provides in pertinent part that:

> The parties may stipulate the amount and nature of such security.  In the event of the inability or refusal of the parties to so stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property due on appraisement whichever is smaller.

The rule goes on to state that "[f]urther security may be required by the court at any time." Rule E(5)(b), Supp. Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions.  Rule 6 provides that "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given; and if the surety shall be or become insufficient, new or additional sureties maybe required on motion and hearing."

Where increases of security are sought under Rule 5, it is well established that an increase in security is available only upon a showing of fraud, misrepresentation, or the mistake of the court, and not that of the claimant in initially assessing the amount of his claim.  *Maritima Antares, S.A. v. Vessel ESSI CAMILLA*, 633 F.Supp. 694, 696 (E.D. Va. 1986); *L.& L. Marine Transportation, Inc. v. M/V HOKUETSU HOPE,* 895 F.Supp. 297, 301 (S.D. Ala. 1995);  *J. K. Welding Co. v. Gotham Marine Corp*, 47 F.2d 332, 335 (S.D. N.Y. 1931).

> While it is true a district court may require "further security" at any time, 28 U.S.C. §2664(b) & Supp. R. E(5)(b), we interpret the phrase to mean *substitute or replacement* security (e.g. when a surety has become insolvent) rather than *additional* security except where the vessel was released by fraud, misrepresentation, or mistake of the court.

*Moore v. M/V Angela*, 353 F.3d 376, 385-86 (5th Cir. 2003).

However, where, as here, due to negotiations between the parties a letter of undertaking includes no stipulated value for the vessel and includes language providing that the amount of the undertaking may be increased by agreement of the parties or by court order, the restrictions traditionally applied in reviewing a request for an increase in security should not apply.  The letter of undertaking involved herein is properly construed to mean that the agreement to set security is not a stipulation as to the value of the vessel subject to the restrictions traditionally applied in reviewing a request for an increase in security, but rather is an agreement as to the amount necessary to secure the release of the vessel which either party can seek to alter by court order.  Because plaintiffs' motion to increase security is a request for the Court to make  a specific determination concerning the value of the vessel, where previously there has been no specific valuation, the Court is making  the initial valuation of the vessel, and as such,  the limited grounds for increasing security would not be applicable.

Considering the Court's prior finding that the value of the CHIOS BEAUTY is $5,500,000.00, the Court grants plaintiffs' motion to increase security and orders that Chios Shipping, or its authorized representative post security in the amount of $5,500,000.00. within 15 days of the entry of this order.

**I.  Prejudgment Interest**

15. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026 , 1028 (5th Cir. 1986).  The denial of prejudgment interest is warranted only "where there are peculiar circumstances would make such an award inequitable."  *Id.*  The Court is not aware of any "peculiar" circumstances which would make an award of prejudgment interest in this case inequitable.  Therefore, plaintiffs are entitled to prejudgment interest at the rate of 4% from August

29, 2005 until paid.

**J.  Limitation of Liability**

16.  "The liability of the owner of any vessel . . . for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of [the] owner or owners . . . shall not . . . exceed the amount or value of the interest of [the] owner in such vessel, and her freight then pending."  46 U.S.C. App. §183 (a)(2000).  Thus, a shipowner is entitled to limitation of liability when it shows that it lacked knowledge or privity with the cause of the loss. *In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001).

"If the shipowner is a corporation, 'knowledge is judged by what the corporation's managing agents knew or should have known with respect to the conditions or actions likely to cause the loss.'"  *Id.*, quoting *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994).  It is undisputed that Harbor Shipping was the manager of the CHIOS BEAUTY and made the operational decision that the vessel would enter the Port of New Orleans, or acquiesced in that decision.  Chios Shipping has not offered any evidence that Captain Konstantinos Orfanos, acting on behalf of Harbor Shipping, exceeded his authority in directing or allowing the CHIOS BEAUTY to enter the Port of New Orleans  on August 27, 2005.  Therefore, Chios Shipping had knowledge of and was in privity with the negligence of its agent in directing the CHIOS BEAUTY to enter the Port of New Orleans after it arrived at Southwest Pass on August 27, 2005.  Accordingly, Chios Shipping is not entitled to limitation of liability.

New Orleans, Louisiana, this 14th day of August, 2008.

_____
STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE